The final case this morning was Zweig v. Schon Council for the Appellants, you may proceed The Supreme Court of Illinois, in the Schwartz v. Piper case, clearly articulated the law in regard to a particular issue involved in adverse possession cases, and that is the location of the, the ability of the plaintiff to locate and identify the specific location for the offence. In this particular case, the court found that the boundaries of a property under adverse possession must be susceptible to specific and definite locations. The claim entitled by adverse possession has to be visible or an ascertainable boundary line. In that case, the Supreme Court reversed a Madison County trial court decision that found adverse possession of the plaintiff. The court in that case, in the recitation of the facts, indicated that the evidence had shown no stone, stakes, monuments, or visible markings of any kind that marked the dividing line between the two tracts. The evidence also set forth by the court said that there were no monuments, corner stones, corner stakes, or other visible markers to indicate where there was ever any established line recognized at any time. The facts in this case are almost exactly the same. In this case, the plaintiff's testimony dealt with two specific potential markers of the boundary line, one being a stone that was on, that was, would have marked the north boundary of the one-foot line. The plaintiff in that case, in this case, indicated various things throughout her testimony, but she says at one point in time, there was a stone in there somewhere. I haven't seen it for years. I don't know if there's a stone there now. There was a stone right around this area. So in her testimony as to the location of the northern point of the one-foot strip in question was very uncertain. She indicated she did not know whether it was there at the time of trial. She didn't know when she last saw it. And so I don't believe that the court can use the stone that can't be identified or located as the north marking point of the one-foot strip in question. In addition, she also testified that she had no, that there was no markings on the south end of the one-foot line. And as a result, we have a one-foot piece of property that the plaintiff cannot locate, either the northern point or the southern point. In addition, there was some testimony about a fence. And her testimony in that area clearly indicated that the fence never was actually on the one-foot line, that it, throughout the years, it would, the fence was moved from time to time, and that it's pretty obvious that the fence could not be used to, well, which also didn't exist at the time of the trial, could not be used to locate this one-foot line. So I think that the facts in the case … Are you basically arguing that there was insufficient evidence for the particularity of the legal description? Yes. I mean, in fact, you know, of course … Let me ask you this question. I see Judge Harrison's order in the appendix. It refers to exhibits with legal descriptions, but I do not see the legal descriptions attached to the order in your appendix. Are you talking about the written … The written order of the file marked June 7th, 2016? Well, I believe that the, I believe that there was attached to the proposed deed that was part of the written order that was, there was a survey there that the plaintiffs had prepared after the, after the hearing. In fact, at the hearing, after Judge Harrison indicates his decision, Mr. Dowling, the plaintiff's attorney, says, well, Judge, I'm going to have to get a surveyor to go out there because he couldn't describe it, you know, as we were sitting there at that time. I believe that the, that the plaintiff had provided a legal description for the portion of the one-foot property and that it was attached as an exhibit to the order that Judge Harrison filed. It's here in my … And that came after the hearing? That came three months after the hearing. And at the hearing, at the end of the hearing, the plaintiff's attorney says to the judge, I guess I'm going, I'm probably going to have to get a surveyor out there. So did he rule orally from the bench? Yes, he did. And then the written order followed three months later, is that what you're suggesting? Correct. Yeah. Does it reflect all that? Pardon me? The record would reflect all that? Yes, it does. The judge, in his reasoning, getting to when he made his decision, he says the things that are, you know, fairly telling to me. He says that, you know, both of you were dealing with the issue that the one-foot strip of land is not on the 50-yard line at the Super Bowl. There's not been some official referee or surveyor out dropping white pitch or dust along the edges of the one-foot strip to clearly identify it for everyone. To make matters a little more intriguing, I'm not a master mathematician, but the last time I checked, the definition of a line segment was one that had two marking ends to it. In this case, I have a marking as to one end of the line. However, I don't have a second marking. And if you, the judge, there was a, the judge basically divided this one-foot line into two segments. There was a testimony that the northern part of the segment was through the wooded area, while the southern part of the segment was in the middle of two farm fields. And the judge in this case gave the plaintiffs adverse possession over the southern part of the one-foot line because it was in the middle of a field. I'm not sure why. And he did not give them adverse possession over the northern part of the line that was in the woods. I believe his reasoning was that it's hard to possess, possibly possess a segment of ground that is in woods and there's no regular activity on it, whereas in the farmland there was regular farming. But I think it's clear that the plaintiff didn't know where the line was. The judge didn't know where the line was. And in fact, the plaintiff had to have it surveyed in order to prepare a judgment order, a proposed deed for the judgment to be fulfilled. I think that the Schwartz case is just right on point. It's exactly the same situation where the Schwartz case, the plaintiffs were not able to testify to any specific state, monument, marking. And as a result, the court reversed the decision of the Madison County Trial Court because there was no definite location for the property in question. And I think one of the things that... So did the judge in his ruling say the woods was the starting point? No. He started at the... There were surveys that were exhibited in the case. And one of the surveys identified a marking or a stone on the door of the park. And that's where the plaintiff said, well, yeah, there was a stone around that area. And so the judge started there. And again, he went through the woods. There's no adverse possession there. But somewhere where the wood stops and the farming starts, then there's adverse possession on behalf of the plaintiff. Well, is it your argument that there's insufficient evidence as to possession of the farm portion or insufficient evidence as to the precise location of the portion which he awarded? Insufficient. Or both? Well, both, I guess. Certainly, first of all, the testimony was that there was two different farmers that farmed on each side of this one-foot line. It was very difficult to imagine that two farmers over a period of years could farm exactly on a one-foot line that's not marked by any fence, not marked by any markers whatsoever. So I don't think that, you know, I think in this case, because you cannot locate specifically where the one-foot strip is located, then all the other, you know, you can't hostilely possess something if you don't know where it is. You know, all of the other elements needed for adverse possession are not here because you can't locate the actual one-foot strip. So the one-foot strip then would lie between the area farmed by two different farmers? Yes. It wasn't the same farmer farming the area on the other side of the one-foot strip, farming both that area and the one-foot strip? No, there were two separate farmers that would farm. One would farm on the east side of the strip and the other would farm on the west side of the strip. There really isn't a strip out there because there's nothing marked. And that's what the evidence was showing in the testimony? Yes. I don't have anything further. Any other questions? No. Thank you, Counselor. We'll have an opportunity for a rebuttal. Thank you. Counsel for the affiliate? Yes, I'm Jay Allen, Counsel for the affiliate. Kind and wise. Let me start by addressing a couple of questions from the court. The court order that was being referenced can be found at C-43. That was the June 7, 2015 order that was entered by Judge Harrison after the The order that I have in the appendix says June 7, 2016. Or is it 2015 or 2016? Maybe I'll put the plus back on. Pardon? Maybe I'll put the plus back on. Sixteen, I'm sorry. That's why I put them up here so I can see them. Well, I had a bad stamp. And then to draw the court's attention as to the procedural aspect, I think, that the court was trying to break out. Essentially, Judge Harrison, in the report of proceedings, pages C-93 and 94, pretty much sort of laid out what his rationale was for rendering this a new record. And that was he granted the one-foot strip in the farmland area by adverse possession to Zweig and Kine, the Appleys in this case, and found that it was hard to openly or notoriously claim by adverse possession of a one-foot strip in the woods because it's in the woods and it's not open. He then directed me to prepare a drafting order for him, and that's on page 95, that gets the new highway description and that led to the order that we just talked about. You asked, Mr. Evans, if the question is whether or not the evidence in the record would show that two farmers never farmed a one-foot strip. And he said, yes, that's what the record would show. That's not what the record will show. In fact, what the record will show is that in 1977, my clients, or their predecessors in interest, bought a tractor plant. And part of that is essentially, if you want to think about it, is an 80-acre tractor with seven bikes. The original owner was his predecessors in interest, the Appellant's predecessors in interest, the Shones, who sold the west half to my clients, the Appleys, left a one-foot strip, then sold the west half to the east half of that 80-acre tractor to Peters. Is there anything in the record that indicates the purpose of retaining a one-foot strip? Is it in the recording instrument or anything? There is a recording instrument. As a matter of fact, Plaintiff's Exhibit No. 1 that was being utilized during the trial in which Mr. Evans referred to when Ms. Kime was testifying on behalf of the Appleys as to the location of this bin was a 1977 plant that showed a one-foot strip. And Mr. Evans was questioning Ms. Kime and saying, okay, where was this stone, where is this bin, where do you remember? And she's pointing to the northern boundary part on that 1977 plant and saying it's right here where the plant says it was. And that is what's in the record. As a matter of fact, on page 27 of the record, Mr. Evans specifically asked Ms. Kime, okay, if we go out there today, right now, can you show me that one-foot strip? And she unequivocally said, yes, and then proceeded to describe how she could locate the strip. And that was, I'm going to stand on the south boundary line, right by Interstate 270, I'm going to look north, I look just to the left of the center of the trees, and the pin is right there, the stones are right there, and that's that one-foot strip. It was clearly defined and ascertainable. She testified historically. Could the record show that the surveyor was able to locate it? Would that be an evidence? You mean the subsequent order that was done? The boundary line. The order that was entered to find the legal descriptions, as was given to you by the judge, there is no evidence in the record from that surveyor when he was out there other than the legal description that says starting at this point, but it doesn't say I found it. There was not a plant associated with the legal description. And there's, I do not recall there being in the actual legal description something that said I found a pin and I started here, as opposed to what you would typically see with the legal description, and that is starting at the northeast corner or the northwest corner of the section that was proceeding in this direction. Did a surveyor testify? We didn't testify today. No, did a surveyor testify at the trial? No, a surveyor testified at the time of trial. This was something that the judge asked after he rendered his decision, and it's at the pages I cited earlier, said here's what I want done in terms of the legal description. You're going to have to provide the legal description on the one-foot strip. And there was, again, the plaintiff's exhibit number one, and he would say, okay, here's where the tree line is. So from the northern boundary line to the tree line, that is still in the possession of the Shones. From the southern point of the tree line all the way to the southern boundary, which is the farm area, that is going to be awarded to my clients, the times and swipes, by Andrew's possession. Give me a legal description. So we had to send a surveyor out there, and that's reflected in here, to say, okay, we've got a one-foot by 869.24-foot strip of land. The judge just divided that 869 feet in half, essentially. Actually, about 368 feet to one and 500 feet to the other. So give me a description based upon what I just ordered. That's why the surveyor went out there to get the legal description of that. Again, northern boundary line to the edge of the tree, edge of the tree to the southern boundary line, so you knew the meets and bounds description. Other than that, no surveyor testified whatsoever. It was just simply the records and the historical data from this time. We repeatedly testified that throughout her family's ownership of it, they knew where the one-foot strip line was. They knew where the pins were, and they, in fact, claimed that one-foot strip. They leased out the one-foot strip. Their tenant, at various times during his tenancy, had horses out there, so he would move the fences around depending on what his needs were, but it incorporated the one-foot strip of time, and in other times it didn't include the one-foot strip. But nonetheless, if it wasn't fenced in, it was farmed, always by the times and his wives, the holders of the—my clients and the holders of the Western 40, if you will. There was—the only evidence that the Shonans put forth was that, well, my father, R. R. Lee Shonan, farmed it maybe until 1980. But then since 1980, neither Arthur Shonan, who testified, nor Arlene Westhall, who testified, said, we never visited the place, never went by it. We drove by it in an interstate kind of way, but we never showed any initial ownership over that one-foot strip. We didn't know what went on with it. We just knew it was there generally. We couldn't locate it. If we tried, we would not have been out there. And that is—so that does not dispute any of this kind of evidence who said, we were out there, we were farming it, we claimed it, we told our farmer, if we had a tenant farmer or our tenant when we were leasing it, this is it. Here's the boundary line. We've got this one foot. This is ours. Everything to the west of that is ours. And they treated it as such. Now, I can understand where the northern stone was, but where is the southern marker? There was no testimony as to where the southern marker was. So what's the story? Essentially, the testimony was that you start at the northern marker and you just go in a straight line to the southern property line, which is right at the right of way line for 270. Right. That's where the point is. It's just a straight line. That point doesn't change. I'm sorry? That point, somebody identified that. Nobody ever identified that point. Ms. Stone testified that's how she would identify it. Ms. Kime testified that's how she would do it. She would stand on the south property line. Right. And look north. And look due north because it was a straight line from that point. Okay. Well, what shows that point in the property? Is there a pin there? On the property line? On the southern property line. There's probably something on Penance Exhibit 1 that was there. There would be a pin marker on it. It's a pin? Let me see what. Do you know what the page number is on that? They've got on Penance Exhibit 1, it denotes an iron pin that was set at the south property line. And the one-foot strip. So is that one-foot strip east or west of that pin? The one-foot strip lies west of the strip, west of that pin. Now, that was never established. Was that established? Yes, sir. I believe it was in the testimony of Ms. Kime. She identified Penance Exhibit 1. I'm sorry? Penance Exhibit 1. Is that what you're talking about? The plaque. Oh, that one. Okay. 1977. But that's. . . Is that marked as an exhibit? It was marked as Penance Exhibit 1, yes, sir. Okay. When the surveyor went out there, did they find the stone in the woods in the north end? Again, the legal description in the order of June 7, 2016. It just says, Commencing at the northwest corner of the northeast corner of Section 34, then south a distance to show the point of beginning. It doesn't show that they started at a pin, per se, as opposed to the northeast corner. And then the plaque that is attached does show, at least what can be shown on this copy, it does show on page 49, actually on the south end,  it shows the south pin that was there, and the northern pin would not have been found in the farm area because they were starting from an arbitrary point. Right. And then in the wooded area, the record at page 50 shows that there is a plaque for the 501 square feet that essentially is the tree area, and it shows that it's supposed to be on exhibit B, but exhibit B does not appear to be attached as part of that particular record. So the property is actually, that we're talking about, is the one foot west of the pin that's at the south. Is that correct? Correct. From the south pin, you're one foot west. Correct. That's cultivated land. That's cultivated land, and that's been farmed by the Avalese for almost 40 years with no indicia of ownership, no claim of ownership, no anything by the Shones, not even a visit to the land, to say, hey, this is ours, stay off of it. Judge Harrison referred to it at one point as a black master in the common sense, but Judge, the two overriding principles here is that this was a bench trial before Judge Harrison who was there to determine the credibility of the witnesses, and, of course, he's in a better position to determine the credibility because he is the trial judge, so if there's evidence in the record to support his findings, his decision should be upheld. That's one principle. The second principle, of course, is that this finding is subject to the manifest way of the evidence standard, and he abuses it. It's against the manifest way of the evidence if, when you look at the evidence in the light most favorable to the prevailing party, a clear opposite result is evident. And so in this particular case, in a technical sense, you have to look at the farmland award of the actor's possession in the most favorable light to my client, and then the award of the tree land, if you will, in the most favorable light of the showman's. Justice Harrison was, Justice, I'm sorry, Judge Harrison, was, I think, very exact in what he was trying to do and very exact in his findings, and even explaining his findings in saying that the plaintiffs, in this case, the Zeigs and Kimes, proved all of the elements of adverse possession. And even the case that Ms. Remington was a side inductee in Schwartz, it dealt with the fact that, in that particular case, and it's factually distinguishable, in that particular case, the plaintiffs came in and their witnesses came in and said, well, here's the sidewalk, and we're two feet from the sidewalk, or we're three feet from the sidewalk, or we're four feet from the sidewalk, or the plant that was introduced in the evidence showed six feet from the sidewalk. So the plaintiffs themselves introduced conflicting evidence as to what was the location of the exact boundaries of the disputed area claimed by Embers' possession. In this particular case, Drupal and Mr. Embers, you know, maybe didn't match up for me. He flat out asked her, could we walk out there today and could you show me the one-foot strip? An unequivocal yes. An undisputed yes. An uncontroverted yes. And she described it. Based upon the standards of review, based upon the evidence in the record, I would request that you affirm the decision, Judge Harris. So the decision, yeah, my question, she described it only to the tree line, to the trees. She described it only to the trees. From what she said is, that's where the stone is. The stone is in the tree line by the driveway, which is West England Drive. And to paint a picture for you, at the very northern end of this disputed track, there is a private roadway, West England Drive. And that runs all the way back to the west, which is really the farmhouse, if you will. As you come off of 159 Main Street through Carbondale, or excuse me, North Carbondale,  is a residential piece of property. Ms. Kyle, or her family and predecessors, actually own that piece of property as well. That's a separate parcel. And the pin is at the northeast corner of that piece of property, or northwest corner of that piece of property. And then you've got the farm track that they call it. So it starts there at the driveway, if you will, of West England on the residential property, goes some amount of feet. And the plaque exhibit one would show the number of feet that it goes through the residential property. And that is 115 feet, approximately, heading toward the south. And then that's the end of the residential property. And then the farm property begins. And some of that farm property right there is still wood, at least according to the legal description that Judge Harrison had requested. There's approximately another 384 feet, 385 feet, that would be tree-lined into the farm area and then pass that farm area on exhibit one, the remaining roughly 368 feet. It is cultivated. The problem I'm trying to figure out is he only ruled on the farm ground, on the farm level. And he said it is not north in the trees and it is adverse possession from the farm ground. That's what I thought. I'm in trouble. Ground-level defendants exhibit number one. Well, at page 91, he starts off by saying, I have an odd lot, and this is at line nine through line 15, essentially. An odd lot would be a kind way of describing it. It's not even an odd lot. It's an abhorrent piece of property that under any ordinary circumstances has no value whatsoever. You can't even go out and stand on, essentially, a one-foot piece of property without trespassing on the enjoyment of the owner's property. And then he talks about, by the same token, both of you are dealing with the issue that the one-foot strip of land is not the 50-yard line at the Super Bowl that we will be experiencing here shortly. And there's not been some official referee or server out trucking white pitch to identify, to clearly identify for everyone to see. And then he goes on to talk about it makes matters more intriguing for the record. And it's the words that he's not a master mathematician, and he talks about having two points. He ultimately goes in there to find at page 90, at the bottom of page 92 and 93, is he's looking at colored photos. The map used by the plaintiffs is included, too. It's visible in the black and white. We have a mixture of kinds of property. We see what's there. Nobody's farming the area that is marked non-crop land, which is the tree area. And everyone gets consistently testified, the best thing I can get consistently, is that a portion of the essentially yellow line that is the one-foot mark down drawn on the aerial photo, which is imaginary, intrudes into those areas that are essentially trees. And the last time you check, I'm not aware of any agricultural pursuit that allows you to drive a tractor through the middle of a tree. Thank you, counsel. It goes on through that, in answer to your question, but it's still there, to describe the difference between onboarding after his possession of the crop land versus the non-crop land. Go read me a survey. Thank you, counsel. Thank you. Thank you. You're welcome. A couple things. First of all, there's a question as to who farmed the ground and did somebody farm the whole thing. The answer in the record is it's not that there was one farmer that had farmed both sides of the trail. Testimony was that there was a man named Dan Lang who farmed the east side of the strip up until the early 2000s. And he never farmed on the other side of that strip. He never farmed for the plaintiffs who owned on the west side of the one-foot strip. So it was never farmed by the same person until maybe recently when the plaintiffs acquired some additional ground. But up until the early 20s, the testimony is clear, or 2000s, that the testimony is clear that it was farmed by two separate farmers, one for the plaintiff, one for the defendant, successors in interest. Farmed property east of the one-foot line. The other thing that, again, she did answer one time, could you locate, if we went out there, could you locate the stuff? And she says yes. But then I question her further and she makes multiple statements that it was around this area. I don't think it's here. So at one point in time she says, yes, I could go locate the stone. But then three or four questions later she says, no, I don't even know if the stone's there. So, I mean, I don't think that the stone's there. There's no indication by anybody that the stone was there. And so I don't think that she, her testimony is believable as to whether or not she could locate the stone at that time. She does say later on, I don't know if it's even there. One other issue Mr. Dowling raised was the credibility of the witnesses. And one thing that I pointed out in my brief as to that issue is that the facts here are this. In 2014, the plaintiffs entered into a contract to sell their property for $950,000. The plaintiff testified that she is a real estate appraiser and that, therefore, she's familiar with real estate transactions, values, and all that. In January of 2014, a title company issues a title commitment that raises this issue of the one-foot piece of property. It's Exhibit 2, I believe. And in that title commitment, there is an indication that my clients own a one-foot strip. After that title commitment is issued, three things happen. Number one, the realtor for the plaintiffs contacts my clients and says, hey, there's a mistake in the legal. We want you to transfer the property to us. Then the plaintiff's attorney contacts my clients, says, hey, here's some documents. Transfer this property to us. And then the third thing is is the plaintiff contacts the defendants directly. Her testimony is not believable. She's had a million-dollar sale of land and she says that, oh, we knew all about this one-foot strip. I'm a real estate appraiser, but I didn't know that that's going to affect our ability to sell our property for $950,000. It's just not believable. What is believable is that she found out when the title commitment came out that there was a one-foot strip they didn't own and that, therefore, they couldn't give clear title to a prospective purchaser for a $950,000 deal. So her testimony, very vague as to the location of the one-foot strip in general and more particularly, I don't think you can believe her testimony because the facts of the matter are a real estate appraiser would know that a one-foot strip is going to affect her family's ability to sell this property for a considerable sum of money. Thank you, counsel. The court will take the matter under advisement and issue a decision in due course. The court will stand in recess for a moment.